## Commonwealth ex rel. Simon v. Maroney

378

*Martin Lubow*, for relator.

*Edward C. Boyle, William C. Smith, Louis Abramson* and *Samuel Strauss*, for Commonwealth.

McNAUGHER, P. J., June 17, 1960.—June 18, 1942, John Simon pleaded guilty to two charges of robbery, two of statutory rape, and one of assault and battery with intent to commit rape. He was sentenced to the State Correctional Institution at Pittsburgh, then the Western State Penitentiary, as follows:

No. 68 June sessions 1942 O. & T.—Statutory rape. Five to ten years to be computed from June 6, 1942.

No. 67 June sessions 1942 O. & T.—Statutory rape. Three to six years to take effect at the expiration of the sentence at no. 68 June sessions 1942.

No. 323 June sessions 1942 O. & T.—Assault and battery with intent to commit rape. Two to four years to take effect at the expiration of the sentence at no. 67 June sessions 1942

No. 65 June sessions 1942 O. & T.—Robbery and receiving stolen goods. Five to ten years to take effect at the expiration of the sentence at no. 323 June sessions 1942

No. 66 June sessions 1942 O. & T.—Robbery and receiving stolen goods. Five to ten years to take effect at the expiration of the sentence imposed at no. 65 June sessions 1942

The sentences totalled 20 to 40 years. He denied having committed the robbery of Kathryn Fisher and that bill at no. 69 June sessions 1942 O. & T. was nolle prossed.

August 20, 1947, March 8, 1949, December 10, 1952, and September 8, 1955, he filed applications with the Board of Pardons of the Commonwealth for clemency, all of which were refused. He was represented by Pearse O'Connor, Esq., in his 1952 application and by John J. McGrath, Esq., in his 1949 and 1955 applications.

March 26, 1952, at no. 3180 April term 1952, Simon, through his attorney, Pearse O'Connor, Esq., filed a petition for writ of habeas corpus, alleging that he had attended elementary school for seven years only and during this time was in a special class for mentally retarded children; that although he was 18 at the time of the hearing in these cases he was unable to read or write but was able to sign his name; that he was not represented by counsel nor was counsel offered to him, and that he pleaded guilty to the charges because he was unaware of his legal rights. In answer to that petition the district attorney denied that he had been prejudiced by the lack of counsel, stated that there were no defenses he could have successfully put

forth, pointed out that prior to coming to court he had admitted all of the crimes to the police, which admissions would have been admissible in evidence against him, and that it was evident that he was guilty of the charges placed against him and knew and understood what he was doing when he pleaded guilty. A hearing was held June 23, 1952, at which petitioner was present and represented by his counsel, and thereafter the court dismissed the petition in all respects except as affecting the case involving the charge of rape of Janet Major at no. 67 June sessions 1942. There it appeared that there had been no actual penetration and that the charge should have been for attempted rape only and the sentence was reduced from three to six years to two and a half to five years. Petitioner's counsel filed an appeal to the Superior Court March 17, 1953, but failed to prosecute it and a non pros was entered.

Petitioner's present counsel presented a petition to the Superior Court October 1, 1959, praying that the judgment of non pros be removed and it was dismissed November 5, 1959. An original petition was then submitted to the Pennsylvania Supreme Court which was denied without prejudice February 3, 1960, with the direction that it be filed with the Court of Common Pleas of Allegheny County. March 10, 1960, another petition for writ of habeas corpus was filed in this court which, after the taking of extensive testimony, the arguments of counsel, and the filing of briefs, is now before us for disposition.

In the present petition it is alleged that John Simon was deprived of his right to due process of law under the Fifth and Fourteenth Amendments of the United States Constitution; that he was 18 years old at the time of sentence but mentally years younger and was unable to read or write; that there was evidence of parental neglect which formerly had caused the juve-

nile court to recommend his commitment to Polk Institute for Defective Delinquents but he was never committed there because of crowded conditions; that he was held four days by the police without being formally charged; that he was induced to sign confessions he did not understand and to incriminate himself before the behavior clinic; that he did not have counsel nor was he notified of his right to counsel; that because he was unaware of his rights he did not interpose defenses which were available to him; that he has been a good prisoner; and that he should not be penalized for failing to prosecute his appeal in the Superior Court because his father was dead, his mother illiterate, and he was not of sufficient mental capacity to understand what had happened. The petition prays that a rule to show cause be granted and a hearing set. April 7, 1960, an amendment was filed, adding to his allegation that parental neglect caused the recommendation for commitment to Polk, the further averment that extreme retardation was also responsible, that he was not afforded a preliminary hearing in the Stella Guskey case, and that the sentences on the pleas of guilty were imposed during a period of public hysteria.

Respondent filed an answer denying that relator was deprived of due process of law; admitting the lack of counsel, the age of relator, his limited education and parental neglect; denying that he was led to incriminate himself in the behavior clinic examination and that he was not aware of the nature and consequences of the pleas; averring that he was advised of his right to counsel; and that he was guilty of the crimes to which he had entered pleas of guilty, understood the nature of the offenses with which he was charged, and knowingly entered the pleas.

The Pennsylvania appellate courts have established the rule in such cases as this that unless it is clearly

shown that "an ingredient of unfairness" actively operated in the process that resulted in the confinement of the prisoner, a writ of habeas corpus should not be granted. They have also held that each case must be tested by the totality of all the facts and not by the application of a general abstract principle that lack of counsel, with certain other facts, is per se a denial of due process. We will therefore examine this case to determine whether such an ingredient was present.

A number of crimes of robbery and rape of women and children had been committed in the Overbrook section of the City of Pittsburgh in the spring of 1942 by a man wearing a blue hood, and on June 2, 1942, the police arrested relator who answered the description given by some of the victims. A blue hood was found on his person and following his arrest no further crimes of the sort were reported in the area. He was identified by the victims and admitted that he had committed the crimes and following a hearing before a magistrate was held for court. He admitted to his mother that he had committed some of the crimes. He also admitted guilt at the time of his behavior clinic examination and before the magistrate. He signed formal pleas of guilty to the charges on which he was sentenced and admitted his guilt in open court during the hearing on his pleas of guilty. He stated that there was one of the charges of which he was not guilty and that bill was set aside and a nol. pros. entered. Later he admitted his guilt to the penitentiary authorities upon his commitment there and also in each of four applications for commutation and in the 1952 habeas corpus proceeding. See Commonwealth ex rel. Sleighter v. Banmiller, 392 Pa. 133, 137. In three of the commutation applications and in the previous habeas corpus action he was represented by counsel. Further, he admitted his guilt in the course

of his testimony in the present proceeding and no allegation of innocence is made in his petition.

In addition to his repeated admissions of guilt, there was additional evidence given by victims and police officers in open court to which he made no objection. In the 1952 habeas corpus petition he not only admitted his guilt but testified that he had the hood on his person when he was arrested and explained how he had made it from a pair of overalls for the purpose of committing the crimes. He led the police to the place where he had disposed of the pocketbook of one of the victims and described how he had prepared a tree branch with which he had clubbed one of his victims.

A behavior clinic was established in Allegheny County in 1936 as an arm of the criminal court after a thorough study by a committee of lawyers, psychiatrists, educators and public-spirited citizens. In recommending its establishment the committee suggested that the findings be available to the sentencing judge to serve as a valuable guide in determining whether the individual in question should be sent to a hospital, an asylum or penal institution. The staff of the clinic consists of psychiatrists, psychologists and trained social investigators, and it is directed to examine defendants where there is any question of mental capacity. Its reports include an evaluation of the facts of the defendant's background, combined with a psychiatric, psychological, physical and social study of the individual, and in the Simon case they consist of approximately 25 pages of single space typing.

Counsel for petitioner appears to hold the view that because defendant is a high grade moron with an I. Q. of approximately 59, he could not have understood the proceedings. The behavior clinic reports were introduced in evidence at the hearing of this habeas corpus proceeding, although normally they are available only to the trial judge and in some cases to the

district attorney and defense counsel. Dr. E. H. Davis, the present director of the behavior clinic, after reading the reports of the examinations made at the time of sentence as well as those in 1959 and 1960 by Dr. James Baker, consulting psychiatrist of the State Correctional Institution at Pittsburgh, examined defendant just before the hearing and testified that Simon was capable of understanding that he was in a courtroom, the nature of the charges to which he was pleading guilty when they were explained to him as they were, and that had the examining physician felt he was not capable of doing so the recommendation would have been that he be committed to a proper institution and his pleas of guilty would not have been accepted, with or without counsel. The summary of the behavior clinic report at the time of sentence reads as follows:

"Subject is not psychotic, but he is mentally deficient of moron intellectual capacity. He is the product of a poor hereditary and environmental background. His father and mother were both alcoholics, abusive to the children, and were finally separated.

"The subject has been in numerous difficulties, including previous juvenile delinquencies such as stealing and two former arrests on sexual charges. In recent years he has become more aggressive and anti-social in behavior.

"He is mentally deficient of moron level and subject to fantasy and definitely controlled by childish reasoning and judgment. His present offense is undoubtedly the result of this.

"Inasmuch as we feel that he is a potentially dangerous individual and will repeat similar offenses in the future, we would recommend prolonged or indefinite institutionalization such as the School for Defective Delinquents at Huntingdon. If admission

there is not possible at this time, we would suggest incarceration until he can be accepted."

At that time Simon could not be admitted to Huntingdon because he was over 18 years of age and that school was not authorized to accept detainees over that age until 1945, and since he was not psychotic and could not be committed to a mental institution, in view of the recommendation and the serious offenses to which he pleaded guilty, there was no choice but to sentence him to the penitentiary. It should also be pointed out that while tests showed that Simon's mental age was about nine years, we understand that a person with a chronological age of 18 and a mental age of nine is a far different person from one both physically and mentally aged nine. The fund of knowledge and experiences acquired during the years increases the capabilities and understanding of such a person far beyond that of a nine year old child: "Clinical Psychiatry", by Dr. Arthur P. Noyes, page 310.

Relator's counsel contends that his client was not informed that he was entitled to an attorney and that on this basis alone, regardless of all other considerations, including the question of his guilt or innocence, the sentences must be invalidated. The first assistant district attorney, called as a Commonwealth witness, testified that continuously since about 1936 the practice in our criminal court has been to bring the prisoners awaiting trial in the Allegheny County Jail to criminal court room no. 2 prior to their entry of pleas, either of guilty or not guilty, and that each separately has the charges against him explained; is asked whether or not he has counsel and if not, whether he desires the court to appoint counsel, and if so a notation is made to that effect and an attorney is duly appointed. He also testified that the record of these arraignments is kept only for a year or so

after sentence, so no record is available in this case. In view of this, it is our opinion that relator was given the opportunity to have counsel appointed. We prefer to believe the testimony of the assistant as to what, as we understand it, has been an invariable practice rather than that of relator, who, at crucial points in his testimony, was, in our opinion, a thoroughly unreliable and discredited witness. It is to be added that Simon himself testified that one of his fellow prisoners told him that the court would appoint an attorney to represent him, but he did not request one, which constituted in effect a waiver of counsel. In the course of his testimony he stated that he would testify falsely if he thought he could by that means secure his release. He also testified that he had made up his mind that he was not going to say anything that would hurt him, and his attorney in the present proceeding said that he had instructed his client not to say anything to the psychiatrist or doctor during the behavior clinic examination. In Commonwealth ex rel. Howard v. Claudy, 175 Pa. Superior Ct. 1, the court held that if relator's evidence is not believed, and that is the case here, the writ should not be granted and it is immaterial whether or not the Commonwealth produces any evidence to contradict it.

There is no evidence that there was any public hysteria such as would influence the conduct of the case. It is true that temporarily there was considerable publicity, as would be expected from the type of crimes and the number committed in the same geographical area within such a short period, but the police investigation and the plea hearing were conducted in a routine manner.

Petitioner's counsel argues that because Simon was unable to write he could not be guilty in one of the cases because the person who committed the crime wrote an obscene word on the pocketbook of the

woman victim. However, during the examination conducted by the behavior clinic he demonstrated his ability to copy words and he had evidently practiced on this one among others. Also, in the 1952 habeas corpus proceeding he admitted writing the word and stated what it was. At that time he also not only admitted all the crimes but related details about them which only the perpetrator could know.

Relator's counsel objects to the "narrative transcript" of what took place at the hearing when the sentences were imposed. These transcripts were never intended to be an official record of such a proceeding. Originally no memorandum of testimony offered at hearings on pleas of guilty was made in our court but the practice was adopted some years ago and continues in effect that a stenographer would take down, not a verbatim record of the testimony, but what he regarded as the salient points of the case and would then prepare what is referred to as the "narrative transcript," a copy of which was given to the sentencing judge for his file and one to the district attorney. Its only purpose was to refresh the general recollection of those officials in any subsequent developments. After reading the transcript here the writer of this opinion generally remembers the case, and is satisfied that the defendant not only knew he was in a courtroom but understood what was involved in the charges and that he was pleading guilty to them. The transcript does not purport to be a complete record but what it contains is sufficient to show that the defendant knew what he was doing. He at no time, as far as we know, indicated that he desired counsel.

The hearing in this case was entirely fair and was not "loosely conducted" as alleged by counsel for petitioner. The behavior clinic reports were fully considered, and the hearing judge also conferred with the juvenile court judge when it appeared that Simon had

a record in that court. Some parts of the evidence offered were given by the victims themselves and generally the police officer in charge of each case outlined the facts in the presence of defendant and the victims. This procedure was proper. See Commonwealth ex rel. Popovich v. Claudy, 170 Pa. Superior Ct. 482, 487, and Commonwealth ex rel. Diggs v. Banmiller, 191 Pa. Superior Ct. 101, 103. The total of the sentences of not less than 20 or more than 40 years not only was fully merited on the basis of the atrocious crimes committed, but it also took account of the findings of the behavior clinic that he was a potential menace to society. Furthermore, the latest examinations, conducted recently by the penitentiary authorities and the behavior clinic, as well as previous ones, indicate that the prisoner has undergone little, if any, change for the better in the 18 years since the sentences were imposed. Had there been marked improvement, the pardon board at one or another of the four separate applications for clemency might have been led to grant commutation.

Counsel for petitioner complains that he was detained four days before formal charges were brought and that this was an unreasonable time for such detention. Considering the number and nature of the offenses involved, the intervening period, spent in completing necessary investigations, was justified.

Although no such allegation was made in his petition, relator testified that he was abused by the police in order to obtain a written confession. There is no indication that there ever was any written confession. If there had been, it certainly had no bearing upon the sentence imposed because it was never mentioned until years later. The only "confession" which was considered by the court were his pleas of guilty in open court and his separate admissions of the various crimes. His counsel argues that he did not know the meaning of the words "robbery" and "rape," but the

crimes were described in simple words by the district attorney, the victims, and defendant himself, and it is clear that he understood the nature of the charges. He never mentioned the alleged brutality at any time prior to this present proceeding although four times he had engaged counsel to examine his case and try to obtain his release through applications for clemency and habeas corpus, and the complete physical examination by the behavior clinic doctor just a few days after this mistreatment is alleged to have occurred revealed no evidence of any abuse. He also testified that the police promised to send him to a place where they had "horseback riding and where I could get an education." He apparently was referring to Huntingdon but he could not have been sent there. There was no attempt made to identify any of the officers who he alleges abused him and made promises to him, and further, his attorney acting for him in the former habeas corpus case testified that relator had never mentioned to him that he had been abused.

It has been held repeatedly by the Pennsylvania appellate courts that lack of counsel coupled with youth and inexperience does not constitute per se a deprivation of due process. Each case depends upon its own facts and relator has the burden of proving by testimony that is clear and convincing that an ingredient of unfairness operated in the process that resulted in his conviction and this he has not done: Commonwealth v. Kadio, 179 Pa. Superior Ct. 196; Commonwealth ex rel. Popovich v. Claudy, supra; Commonwealth ex rel. Diggs v. Banmiller, supra; and Commonwealth ex rel. Reese v. Claudy, 170 Pa. Superior Ct. 488. It was also held in Commonwealth ex rel. Ringer v. Maroney, 177 Pa. Superior Ct. 509, 511, that the fact that a defendant is a moron, coupled with lack of counsel, of itself is not a sufficient ingredient of unfairness as to invalidate a plea of guilty,

and it would be all the more true in a case such as this where defendant was a *high grade* moron.

It has been 18 years since John Simon pleaded guilty to the various charges involved here and was sentenced. He has in that time made four applications for commutation, in three of which he was represented by counsel, and not until March of 1952 in the first habeas corpus petition did he mention not having counsel or raise the question of his mental deficiency.

In Commonwealth ex rel. Howard v. Claudy, supra, at page 5, regarding the presumption of regularity which a judgment of conviction carries with it, the court said:

"Our courts have never said that this presumption is conclusive, but when one undertakes to overcome it, his evidence should be clear and convincing. Furthermore, the longer the judgment stands, the stronger the presumption becomes.

"Of course, relief can be granted on a relator's testimony alone, whether contradicted or not, if the court believes the relator. Relief, however, should not be granted if the court believes that relator's evidence is not credible, or is not legally sufficient to overcome the presumption of regularity.

"If the court does not believe relator's evidence, the writ should not be granted, and it is immaterial whether or not the Commonwealth produces any evidence to contradict his evidence. Commonwealth ex rel. Bruce v. Burke, 170 Pa. Superior Ct. 642, 643, 90 A. 2d 258 (1952); Hawk v. Olson, 326 U. S. 271, 279, (1945) 66 S. Ct. 116, 90 L. Ed. 61."

See also Commonwealth ex rel. Savage v. Hendrick, 179 Pa. Superior Ct. 601, 603, and Commonwealth ex rel. Schenck v. Banmiller, 190 Pa. Superior Ct. 467, 469.

Another of petitioner's contentions is that there was no preliminary hearing in the case involving Louise

Guskey. The record is directly to the contrary and shows clearly that such a hearing was held. The point is also immaterial, since such matters cannot properly be considered in a habeas corpus proceeding.

In the case of Commonwealth ex rel. Diggs v. Banmiller, supra, the court said, at page 104:

". . . Here, most certainly, this relator has failed to sustain this burden. We have held in a similar factual situation that a relator's delay of 9 years before making an application convicted him of such laches as prevented him from now raising the question where in that case it appeared that the sentencing judge and the city detective, who was alleged to have promised relator a suspended sentence at the time of the guilty plea, were both deceased. Com. ex rel. Robinson v. Cavell, 185 Pa. Superior Ct. 52, 138 A. 2d 172 (1958).

" 'The federal Constitution does not command a state to furnish defendants counsel as a matter of course, as is required by the Sixth Amendment in federal prosecutions; lack of counsel at state non-capital trials denies federal constitutional protection only when the absence results in a denial to accused of the essentials of justice.' . . . In this case, the record does not show, nor the relator did not contend that he requested and was refused counsel, . . . but his contention seems to be that because of the lack of counsel, together with the fact that he was under 18 years at the time of the sentence, that the sentence itself was illegal and he is therefore entitled to the writ. The factors of youth and inexperience coupled with a serious charge do not per se establish any element of unfairness in the proceeding resulting in confinement. . . ."

See also Commonwealth v. Asher, 181 Pa. Superior Ct. 80. Here relator waited 10 years before mentioning his lack of counsel rather than the nine which was held too long in the Diggs case, he was 18 years of age

and in the Diggs case defendant had not quite attained that age, and Simon does not contend that he requested counsel and was refused.

Federal decisions in some cases have held that lack of counsel in and of itself may be sufficient to invalidate a sentence but that each case must stand on its own facts and circumstances. The due process provision in the United States Constitution was clearly intended to provide adequate safeguards to protect the innocent from unjust conviction and imprisonment but not to serve as a shield by means of which criminals such as this one, who many times with and without counsel has admitted his guilt, may defeat justice. In our opinion defendant's guilt is pertinent in this proceeding, and particularly so since he does not protest innocence. John Simon was given every opportunity to deny his guilt of the charges at the hearing when the sentences were imposed and in fact did deny committing one of them and it was set aside. His pleas of guilty in the other cases were substantiated not only by the testimony of officers who had made thorough investigations of the facts but also by several of the victims of his crimes. In addition, there was physical evidence of his guilt, the club, pocketbook, the hood, etc.

Counsel for Simon cites the cases of Uveges v. Pennsylvania, 335 U. S. 437; Pa. ex rel. Herman v. Claudy, 350 U. S. 116; Moore v. Michigan, 355 U. S. 155; Palmer v. Ashe, 342 U. S. 134; Massey v. Moore, 348 U. S. 105, and Blackburn v. Alabama, 80 S. Ct. 274.

In the Uveges and Herman cases, the lower court did not grant a hearing in the habeas corpus proceedings. In the Moore case, the charge was murder; defendant claimed there was "something wrong with his head," but no psychiatric examination was made, and there was actual evidence that relator was threatened

with mob violence if he did not plead guilty. In the Palmer case, there was no hearing granted in the habeas corpus proceeding; relator was an imbecile, and he had been told that he was charged with breaking and entering, but was actually indicted for robbery. Here defendant was clearly told what he was charged with and was sentenced only in the cases which he admitted. In the Massey case, relator was insane when he entered his plea and the court refused to even hear that allegation. In the Blackburn case, the ground was that relator was convicted on the basis of a confession made during the period that he had been adjudged insane by a lunacy commission. None of these cases are in the slightest comparable with the one before us and are in no sense controlling.

Here not only was a full hearing granted at which petitioner was represented by counsel in the 1952 habeas corpus proceeding but in the present case several days were consumed in the taking of testimony. The Commonwealth agreed not to interpose the objection of res judicata, which might properly have been done, and the petitioner and his counsel were given full opportunity to present whatever evidence was available.

A careful examination of the testimony in both habeas corpus cases and a consideration of the arguments and briefs of counsel, including a brief submitted by the Civil Liberties Union for which a special appearance was entered, leads us to the conclusion that the petitioner was clearly guilty of the offenses charged, properly sentenced, and has not met the burden of proof of showing that his lack of counsel at the time of sentencing amounted to an ingredient of unfairness actively operating in the process that resulted in his confinement by reason of which the sentences should be invalidated.

394

The rule to show cause why a writ of habeas corpus should not issue will be discharged and the petition dismissed.

*Order*

And now, to wit, June 17, 1960, the rule to show cause why a writ of habeas corpus should not issue is hereby discharged and the petition dismissed.

Eo die, exception noted to petitioner and bill sealed.